JOHN MONKS & SONS v. WEST STREET IMPROVEMENT CO. et al.

(Supreme Court, Appellate Division, First Department.   March 8, 1912.)

1. CONTRACTS (§ 99*)—PROCEEDINGS—SUFFICIENCY OF EVIDENCE.

   Evidence in mechanic's lien proceedings by one contracting to excavate a building site *held* not to show a mutual mistake, in that defendants, as well as plaintiff, believed that all of the cribbing in which piles were to be driven or which was to be removed was earth cribbing, and none of it rock cribbing.

   [Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 448–453, 1197–1199; Dec. Dig. § 99.*]

2. PRINCIPAL AND AGENT (§ 177*)—EXISTENCE OF AUTHORITY.

   Where negotiations between plaintiff and defendants for the excavation of a building site by plaintiff were conducted for it by an engineer, who made the proposal to contract for the work in plaintiff's name, plaintiff was chargeable with the engineer's knowledge of a memorandum de-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

livered by defendants to him, relating to the nature of the work to be done.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 670–679; Dec. Dig. § 177.*]

3. PRINCIPAL AND AGENT (§ 182*)—PROCEEDINGS—SUFFICIENCY OF EVIDENCE.
Evidence in proceedings by a contractor to enforce a mechanic's lien for work done in excavating a building site *held* not to sustain a finding that a certain memorandum relating to the nature of the work was not delivered to the contractor's agent, so as to bind the contractor.

[Ed. Note.—For other cases, see Principal and Agent, Dec. Dig. § 182.*]

4. CONTRACTS (§ 93*)—MUTUAL MISTAKE.
In order to rely on a mistake in executing a contract, both parties must have been mistaken as to the matter.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 415–419; Dec. Dig. § 93.*]

5. CONTRACTS (§ 97*)—JUDICIAL PROCEEDINGS.
A contractor, by pleading a special contract for excavation work in mechanic's lien proceedings and recovering on the basis of the contract price, estopped itself from claiming that there was a mutual mistake as to a part of the contract relating to the removal of and driving piles in certain cribbing work, in that both parties contemplated that the cribbing contained earth, and not rock, filling.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 442–446; Dec. Dig. § 97.*]

Appeal from Judgment on Report of Referee.

Mechanic's lien proceedings by John Monks & Sons against the West Street Improvement Company and others. From a judgment for plaintiffs, defendants appeal. Affirmed on condition.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, MILLER, and DOWLING, JJ.

L. L. Kellogg, for appellants.

W. A. Keener, for respondents.

MILLER, J. The defendant the John Pierce Company, which for brevity I shall hereinafter refer to as the defendant, contracted to erect a building for the defendant the West Street Improvement Company on the west side of West street between Albany and Cedar streets, in the borough of Manhattan. It invited bids from different contractors for doing the excavating work and preparing foundations, and, pursuant to that invitation, the plaintiff on September 15, 1905, submitted a proposition in writing to excavate over the entire area of the lot down to the level of 13 feet, 11 inches below the curb, to furnish and drive piles of the number shown on plans exhibited, to excavate for and build concrete piers up to the grillage beams, to shore and underpin adjoining buildings if necessary, to excavate for the boiler pit, and to sheath pile the streets, build sidewalk bridges, and do all necessary pumping for the lump sum of $77,500, and to drive extra piles, make extra excavation and furnish materials for, mix, and place concrete for cellar floor at stated unit prices. The defendant replied in writing, accepting the proposal upon condition that a satisfactory agreement should be signed, that the work should be completed before January 1, 1906, and that for each day's delay beyond that time the plain-

tiff should pay the sum of $100. It was also proposed that the plaintiff should do certain additional work. Those conditions do not appear to have been assented to. Nevertheless, without waiting for an agreement to be made and a formal contract to be executed, the plaintiff commenced to excavate for the building. The defendant caused specifications and a formal contract to be prepared, but, when that was submitted to the plaintiff, it refused to execute it for the reason that it had discovered in the progress of the work rock-filled cribbing where piles had to be driven, which, it claimed, was different from the situation indicated on the blue prints upon which it had submitted its proposal. Thereupon the defendant in a letter to the plaintiff stated its position in effect to be that the plaintiff was bound to complete the work in accordance with its proposal, notwithstanding unexpected developments, and suggested that the plaintiff could follow one of two courses: (1) Abandon the work and take the risk of being subjected to damages for breach of contract; (2) complete the work in accordance with the specifications, and, if its view turned out to be correct, recover extra compensation on account of the new developments. Without anything more definite being agreed upon, the plaintiff continued the work. The original plans were changed from time to time, requiring extra work which the plaintiff performed.

The plaintiff pleaded in its complaint the contract evidenced by the letter of September 15, 1905, and sought to recover the stipulated lump sum specified in the contract, the stipulated unit prices for extra work, and stipulated prices for extra work performed under subsequent modifications of the contract. On the hearing before the referee, the plaintiff was permitted, over the defendant's objection and exception, to introduce evidence in support of its claim that its proposal of September 15, 1905, was submitted under a mutual mistake of fact as to the presence of rock-filled cribbing, and, at the close of its evidence, was permitted to amend the complaint to conform to the proof. The plaintiff's evidence established the performance of work amounting, according to the stipulated unit prices and lump contract price, to $103,850.01. It had received $83,485.98, leaving unpaid the sum of $20,364.03, which with interest to the time of the judgment amounted to $25,937.-11. The defendant does not question the plaintiff's right to recover that sum. The plaintiff also established without serious dispute that the presence of rock-filled cribbing increased the expense of doing the work by the sum of $23,003.85, which with interest amounted to $29,-299.25. The right to recover the latter sum only is involved on this appeal.

[1] We shall assume that, upon the plaintiff's theory of the case, it could recover in this mechanic's lien suit the sum in dispute as for extra work, and that the admission of evidence to sustain that theory and the subsequent amendment of the pleadings to conform to it were proper, and shall come directly to the merits of the controversy. Negotiations leading up to the commencement of the work were conducted on behalf of the plaintiff by one Charles H. Deans, an engineer. The proposal of September 15, 1905, was signed, "John Monks & Sons, per Charles H. Deans." Prior thereto, the defendant's engineer had invited Deans to submit a proposal, had furnished him a sketch of test

borings made for the defendant, a blue print showing location of test holes, and a section showing the position and character of the materials, and had informed him that the defendant had men on the lot digging pits in various places, and had invited him to inspect the premises. The sketch of test borings and the blue print section showed what any one familiar with the location would doubtless have known, even without that information, that the material to be excavated was filled-in or made land upon river mud and sand. Cribbing was indicated, though the extent of it was not shown, and upon the blue print plan there was a sketch showing a vertical section of what was styled "typical old timber foundation," indicating timber crib work, and in the spaces between the timbers, as shown on the sketch, was the word "earth." It is not entirely plain, at least to one who is not an engineer, whether the spaces marked "earth" were intended to represent the interstices between the timbers or the pockets of the crib itself. The plaintiff's theory is that the typical timber foundation shown on the plan indicated earth-filled cribbing; that both parties contracted upon the assumption that that was typical of all the crib work; that its contract required it only to drive piles in earth-filled cribbing; and that it is therefore entitled to recover as for extra work the additional expense caused by the stone-filled cribbing. The defendant called experts who testified that the typical section shown on the plan indicated to them crib work, containing more or less stone. The plaintiff's experts, and even its general manager, who had had considerable experience in excavating along the North River, testified that the typical section shown on the plan indicated an earth-filled crib, but all said that in their experience in excavating crib work along the North River they had always found more or less stone. They explained that, however, by saying that, if a crib was to be sunk in mud, and was intended only to sustain vertical pressure, it was customary to sink timbers in the mud, and at some distance from the bottom to build a flooring, and to weight the crib with rock placed thereon. All admitted, however, that to resist lateral pressure the crib would have to be filled with stones.

A mere glance at the blue print plans suggests that the purpose of the cribbing was to resist lateral pressure, to support the made or filled-in land, and it seems to us that, independently of the plans, that would occur to any one as familiar with the location as the plaintiff was. There is no suggestion of bad faith on the part of the defendant. Indeed, the plaintiff's theory is that of mutual mistake. The defendant gave the plaintiff such information as it had—i. e., the blue prints prepared for it by engineers—showing test borings and the character of materials discovered, but those blue prints did not purport to be a complete representation of all the materials to be excavated or encountered in the driving of piles. The information that men were digging pits, coupled with the invitation to inspect the premises, was notice to the plaintiff that it could not rely upon the blue prints as completely showing the situation. The plans formed no part of the plaintiff's proposal, except in so far as they showed the number of piles to be driven. The proposal was not limited to driving piles in, or making excavations of, specified material, and we think that, in view of the fact that the blue print plans did not purport to be a complete repre-

sentation of the work to be done, in view of the invitation of the defendant to inspect the premises, and in view of the plaintiff's familiarity with the location and presumed knowledge of the probability that stone-filled cribs would be encountered, it was incumbent upon the plaintiff to investigate and ascertain for itself the situation, or, failing that, to protect itself by limiting its proposal to work of the character indicated by the blue prints. If the proposal had been thus limited, it is altogether probable that some other bidder would have got the contract.

Moreover, the defendant's engineer testified without dispute that he prepared a paper styled "memoranda for bidders," and that he delivered a copy of it to Deans. That memorandum stated that all information available was given on accompanying blue prints, specified how far the excavation was to be carried, how concrete was to be made, and called for proposals for specific items of work. It also contained this statement:

"Note that the 'typical crib' foundation shown on this plan was found only at boring 3, at the other points marked 'crib' the wash pipe was stopped by timber but the nature and extent of same was not determined."

Deans had died before the trial. The plaintiff's manager testified that he had never seen that memorandum. It is claimed that the positive testimony on direct examination of the defendant's engineer is weakened by the following statement on cross-examination:

"It is my recollection that I gave also to each one of these bidders this memorandum for bidders known as 'Exhibit E.' Undoubtedly I did. They had to have that to start on the figures. At this time, our specifications were not prepared."

[2] It is also urged that, even if Deans did have the memorandum, his knowledge was not the knowledge of the plaintiff. But that contention overlooks the fact that all of the negotiations on behalf of the plaintiff were conducted by Deans, and that the proposal was made in the plaintiff's name by Deans. Of course, if that memorandum was delivered to him, the plaintiff was called upon to ascertain for itself, before submitting a proposal, the character of the work to be done.

[3] The referee found that said memorandum was not delivered to Deans. We think that finding against the evidence. It is opposed both to uncontradicted testimony and to the probabilities of the case. But, even if it was not delivered to Deans, it is of itself sufficient to refute the plaintiff's claim of mutual mistake. It was concededly in existence. Each of the other bidders testified that he received a copy of it. It establishes beyond peradventure that there was no mistake on the defendant's part.

[4] It did not contract on the assumption that only earth-filled cribs would be encountered, and, to recover upon the theory of mutual mistake, it is not enough to show that one party to the contract was mistaken. It does not necessarily follow from the fact that the defendant was not mistaken that it was guilty of misrepresentation; but we do not need to consider that as no such issue is involved. The evidence and the rules of law applicable to a controversy involving such an issue are very different from those involved in this case.

I have considered the case upon the assumption that the plaintiff's proposal of September 15, 1905, was accepted, and became a binding contract. In fact, however, the acceptance was not unconditional, something remained to be agreed upon, and it may be that the plaintiff could have recovered for all the work done on a quantum meruit. Under the circumstances disclosed in this case, a recovery on that basis would doubtless have been just between the parties. The contract price was evidently favorable to the plaintiff. At least, it has indicated an eagerness to hold fast to it.

[5] It has pleaded the contract and has recovered the stipulated contract price, both the lump sum and the unit prices for the extra work. It has thereby concluded itself from asserting that there was not a meeting of the minds upon all of the provisions of the contract, and it would be manifestly unjust to the defendant to give the plaintiff the stipulated prices and an additional sum for work covered by the contract, but which for unforeseen circumstances cost more than the plaintiff expected.

The judgment should be reversed and a new trial granted, with costs to appellant to abide the final award of costs, unless the plaintiff stipulate to reduce the recovery to the sum of $25,937.11, in which event the judgment, as modified, should be affirmed with costs to the appellant. All concur.